**EXHIBIT 2**

**PUC Inc.**
SERVICES

# WASTEWATER TREATMENT SERVICES AGREEMENT

THIS AGREEMENT made effective this 1st day of July, 2003

BETWEEN:

    THE CORPORATION OF THE CITY OF SAULT STE. MARIE
    hereinafter called the "Owner"

                       OF THE FIRST PART

AND

    PUC SERVICES INC.
    hereinafter called "PUC Services"

                       OF THE SECOND PART

CONCERNING:

    OPERATION AND MAINTENANCE OF THE
    CITY OF SAULT STE. MARIE'S WASTEWATER TREATMENT
    FACILITIES

RECITALS

(a) PUC Services is in the business of providing operation and maintenance services ("Services") for water and wastewater facilities.

(b) The Owner is the owner of the facility, more particularly described in Schedule A (the "Facility").

(c) The Owner wishes to retain the services of PUC Services to operate and maintain the Sault Ste. Marie Wastewater Facilities (as further described in Schedule A, the "Facility") in accordance with the provisions of this agreement (the "Agreement")

(d) The Owner and PUC Services (collectively, the "Parties") are entering this Agreement to clarify and set out their respective rights and obligations with respect to the operation, maintenance, invoicing and payment arrangements for the facility.

(e) The Council of the Owner on the _23rd_ day of _June_, 2003, passed By-Law No. _2003-154_ authorizing the owner to enter into this Agreement.

NOW THEREFORE the Owner and PUC Services agree as follows:

## ARTICLE 1 - INDEX TO DEFINITIONS

**Section 1. 1 - Definitions**

In this Agreement, definitions are set out in Schedule B, or within applicable provisions as indicated.

## ARTICLE 2 - RESPONSIBILITIES OF PUC SERVICES

**Section 2. 1 - Retention of PUC Services**

The Owner retains PUC Services to provide management, operation, administration and maintenance services, as further described in Schedule "C" to this Agreement, in respect of the Facility (the "Services").



**PUC Inc.**
**SERVICES**

### Section 2. 2 - Performance of Services

(a) PUC Services shall operate the Facility in compliance with all applicable laws, regulations and authorizations except as described in Paragraphs 2.2(b) and (c) below and in any of the following circumstances:

  (i) the Owner not making the Capital Expenditures reasonably recommended by PUC Services in the Estimate as described under Section 4.6 below;

  (ii) mechanical failure of any equipment at the Facility unless the mechanical failure is due to negligent maintenance or operation by PUC Services;

  (iii) the wastewater transmitted to the Facility for treatment does not meet the requirements of the Owner's sewer use by-law or any Applicable Law;

  (iv) the wastewater transmitted to the Facility for treatment contains contaminants or other substances which cannot be treated or removed by the Facility's processes; or

  (v) the quantity of wastewater transmitted to the Facility exceeds the Facility's design capacity.

(b) PUC Services may temporarily cease to provide or reduce, the level of provision of Services hereunder in the event of an emergency, a breakdown or any Uncontrollable Circumstance; provided, however, that PUC Services shall, when practicable, endeavour to give the Owner reasonable advance notice of each such occurrence.

(c) Notwithstanding any other provision of this Agreement, delay in the performance of, or a failure to perform any term of this Agreement by PUC Services, shall not constitute default under this Agreement or give rise to any claim for damages suffered by the Owner if and to the extent caused by occurrences or circumstances beyond the reasonable control of PUC Services, including but not limited to, decrees of government, acts of God (including but not limited to hurricanes, tornadoes, floods and other weather disturbances), sabotage, strikes, lockouts and other industrial disturbances, insurrections, war, civil disturbances, riots, explosions, fire and acts of third parties (any such occurrence or circumstance is referred to as an "Uncontrollable Circumstance").

(d) PUC Services, in its discretion, shall take remedial measures that it determines are reasonably necessary to attempt to maintain compliance with Applicable Laws. Within the context of Section 2, such measures may be beyond the Services and as such would be subject to extra costs as described in Paragraph 4.5 (f). PUC Services shall use its best efforts to contact the Owner and obtain the Owner's approval prior to undertaking such remedial measures.

(e) Notwithstanding Paragraph 2.2(d) above, the Owner recognizes that such remedial measures taken by PUC Services may be as a result of an emergency situation or an Uncontrollable Circumstance and that in such situations PUC Services' primary concern will be making all reasonable efforts to maintain compliance with Applicable Laws.

(f) The Owner has retained a consultant to prepare operating and maintenance specifications that are specific to the Facility (the Specifications). PUC Services shall operate the Facility in accordance with the Specifications to be established. While it is anticipated that the Specifications will not require a lower level of operating and maintenance activities than the current practice, it is agreed by the parties hereto that any significant impact on operating costs, either increase or decrease, shall be negotiated.

### Section 2. 3 - Excluded Services

Any services not set out in the Services (the "Excluded Services") are excluded from this Agreement and, without limiting the generality of the foregoing, those services set out in Schedule "D" to this Agreement are examples of Excluded Services. If the Owner subsequently requires PUC Services to provide the Excluded Services, they may be provided at additional cost to the Owner.

### Section 2. 4 - PUC Services as Independent Contractor

In performing the Services, PUC Services shall be acting as an independent contractor and only to the extent and for the specific purposes expressly set forth herein. Neither PUC Services nor its employees, agents or subcontractors shall be subject to the direction and control of the Owner, except as expressly provided in this Agreement.



**Section 2. 5 - Authorized Representatives**

Each of PUC Services and the Owner shall be entitled to designate in writing to the other one or more Individuals who shall be authorized to represent it in connection with the day-to-day administration of the provisions of this Agreement (the "Authorized Representatives"). Each of the parties shall be entitled to rely on the acts and approvals given by the other party's Authorized Representative until such time as it receives a written notification of change in the other party's Authorized Representative

**Section 2. 6 - Reporting**

Within thirty days of the completion of each calendar quarter or such other period as the Owner and PUC Services may agree upon, PUC Services shall provide the Owner's Authorized Representative with a report describing the Facility's performance for that period.

**Section 2. 7 - Access to the Facilities**

As the operator of the Facility, it is the responsibility of PUC Services to ensure the integrity of the operation of the Facility as well as the health and safety of PUC Services staff and, as necessary, any contractors and other persons visiting or working at the Facility, including any representatives of the Owner who may be visiting the Facility.

To ensure that both PUC Services and the Owner can meet their respective responsibilities with respect to the Facility, the Owner shall ensure that its staff, agents and/or contractors (the "Owner Representative") who have access to the Facility will follow the following protocol:

(a)  Owner Representatives will provide PUC Services' operations manager for the Facility with reasonable advance notice of their intention to visit the Facility;

(b)  All visits made by Owner Representatives shall be made during normal working hours while PUC Services staff are present at the Facility;

(c)  All Owner Representatives visiting the Facility must sign in and out of the logbook. At all times, PUC Services staff need to be aware of who is visiting the Facility and their whereabouts;

(d)  No Owner Representative will be allowed access to the Facility until they have received a risk/hazard orientation session with PUC Services staff. The purpose of this orientation session would be to ensure that all Owner Representatives are made aware of the potential safety risks/hazards at the Facility as well as those areas of the Facility where access is prohibited ( e.g. confined spaces). All Owner Representatives visiting the Facility should wear appropriate attire (e.g. safety footwear) and be familiar with the Owner's safety procedures as well as the procedures set out in PUC Services' Safety Manual (recognizing that in some circumstances Contractors retained by the Owner may have their own Health and Safety Policy in place that is adequate to address the risks within the Facility or the work being performed);

(e)  Owner Representatives shall not in any way interfere with PUC Services' operation of the Facility and, in particular, Owner Representatives shall not at any time manipulate/adjust/re-set any equipment, process control, etc. within the Facility without the prior approval of the Facility's Operation Manager;

(f)  The Owner shall release PUC Services its directors, officers, employees and agents (collectively the "Released Parties") from any and all actions, damages, claims, liabilities, injuries, costs and charges (each a "Claim") associated with any action taken or failure to act by an Owner Representative while visiting the Facility and the Owner shall take full responsibility for any Claims resulting from any actions or failure to act of an Owner Representative at the Facility and shall indemnify PUC Services and the Released Parties for all such Claims incurred or suffered by PUC Services and/or anyone or more of the Released Parties as a result of such actions.

**Section 2. 8 - Indemnification of the Owner**

PUC Services shall exonerate, indemnify and hold harmless the Owner, its officers, employees and agents from and against any and all Claims which may be suffered or incurred by, accrue against or be charged to or recoverable from the Owner that are caused by PUC Services' negligence or willful misconduct when performing the Services. The Owner shall be deemed to hold the provisions of this Section 2.8 that are for the benefit of the Owner's officers, employees and agents in trust for such officers, employees and agents as third party beneficiaries under this Agreement.

**PUC Inc.**
**SERVICES**

**Section 2. 9 - Insurance**

(a) PUC Services shall arrange for insurance coverage of the Facility as described in Schedule "E" to this Agreement (the "Insurance") and, with the exception of automobile insurance, the Owner shall be an additional insured under such Insurance. If there is a significant change in the Insurance, the Owner will be notified of such change.

(b) The Owner may, at its cost, maintain additional insurance in respect of the Facility if it wishes and PUC Services shall be an additional insured under such insurance.

(c) The Owner shall be responsible for securing its own insurance for any operations with which it is involved or which are Excluded Services that are not the subject of this Agreement. The Owner acknowledges that it will have no recourse under PUC Services' policies of insurance for any such operations.

(d) In the event of a claim under the Insurance, the payment of deductibles is as specified in Schedule "E".

**Section 2. 10 - Representations and Warranties of PUC Services**

PUC Services represents and warrants to the Owner that the following are true and correct:

(a) That it has power and authority and has taken all necessary steps to enter into and perform its obligations under this Agreement; and

(b) PUC Services' staff are trained and capable of carrying out the terms of this Agreement.

## ARTICLE 3 - RESPONSIBILITIES OF THE OWNER

**Section 3. 1 - Representations and Warranties of the Owner**

The Owner represents and warrants to PUC Services that:

(a) The Owner has the full power and authority to enter into and perform its obligations under this Agreement.

(b) The Owner has passed all necessary by-laws and obtained all necessary Authorizations to enable it to enter into and perform its obligations under this Agreement and to operate the Facility, including without limitation, any Authorizations required from the Ontario Municipal Board and the Ministry of the Environment, and each of the Authorizations are in good standing.

(c) The Owner has provided PUC Services with a true copy of each of the Authorizations referred to in paragraph 3.1 (b) above, prior to the date of execution of this Agreement, including a certified copy of each municipal by-law and other approval required to authorize the Owner to enter into and perform its obligations under this Agreement.

(d) As owner of the Facility the Owner is fully aware of its responsibilities and obligations and, as part of its due diligence in operating the Facilities, has selected PUC Services as operator to provide the Services.

**Section 3. 2 - Covenants of the Owner**

The Owner hereby covenants for the benefit of PUC Services:

(a) The Owner agrees to promptly provide PUC Services with any information relating to the Facility which could have a bearing on the provision of Services by PUC Services.

(b) The Owner shall repair, maintain and keep in a good working state, in accordance with good engineering practice and the standards reasonably applicable to an owner of like facilities, all wastewater works that belong to or are under the control of the Owner and that collect and transmit wastewater to the Facility.

(c) The Owner shall take reasonable steps to ensure that wastewater transmitted to the Facility complies with the Owner's sewer use by-law and any Applicable Law.



Section 3. 3 - Exoneration and Indemnification of PUC Services

(a) Subject to Paragraph 3.3(c) below, the Owner shall exonerate, indemnify and hold harmless PUC Services, its directors, officers, employees and agents (collectively referred to as the "Indemnified Parties") from and against any and all Claims which may be suffered or incurred by, accrue against, or be charged to or recoverable from any one or more of the Indemnified Parties that, in any way, either arise from or are connected with the operation of this Agreement.

(b) PUC Services shall be deemed to hold the provision of this Section 3 that are for the benefit of PUC Services' directors, officers, employees and agents in trust for all such Indemnified Parties as third party beneficiaries under this Agreement.

(c) Notwithstanding the other provisions of this Section 3, the Owner shall not be liable in respect of damages arising out of any Claim where:

   (i) to the extent that such Claim is covered by the Insurance or a policy of insurance put in place by PUC Services, the premiums of which were paid for by the Owner; or

   (ii) where the Claim arose solely as the result of PUC Services' negligence or willful misconduct in providing the Services.

## ARTICLE 4 - ARTICLE 4- TERM, PAYMENT FOR SERVICES AND OTHER CHARGES

Section 4. 1 - Initial Term of Agreement

This Agreement shall start on July 1, 2003 and shall continue in effect for an initial term of five and a half years (the "Initial Term") and then shall be renewed for successive five year terms unless terminated under Section 6.2 of this Agreement.

Section 4. 2 - Annual Price for Initial Term

(a) Subject to any adjustments made pursuant to other provisions of this Agreement, the Owner shall pay PUC Services for provision of the Services, a price for each year of the Initial Term in the following amounts (the "Annual Price"):

   (i) For Year One from July 1, 2003 through to December 31, 2003 inclusive:
   (One half of the full year price of

   (ii) For Year Two beginning January 1, 2004 and subsequent Years:                    plus an adjustment for inflation calculated as described below in Paragraph 4.2(b).

(b) Statistics Canada Consumer Price Index, All Items (Ontario) ("CPI") shall be used to calculate the inflation adjustment referred to in Paragraph 4.2(a) above. The percentage difference between the CPI during June of the previous year as compared to the CPI of June of the current year, less the reduction identified in Paragraph 4.2(c), shall be the inflation adjustment for the next year. For example, the inflation adjustment for year 2004 is the CPI of June 2003 divided by the CPI of June 2002. The adjustment will be calculated as soon as necessary information is available from Statistics Canada and the Annual Price will be retroactively adjusted to January 1. In year two of the Agreement and subsequent years, the inflation adjustment shall be added to the Annual Price for year one of the Agreement on a cumulative basis.

(c) The reduction referred to in Paragraph 4.2(b) above shall be equal to one half (1/2) percent. This reduction shall not be used to reduce the inflation adjustment, in any particular year, to less than zero (0) percent.

Section 4. 3 - The Annual Price in Renewal Terms

The Annual Price for any renewal term will be as agreed between the Owner and PUC Services. If the Parties can not agree on the Annual Price for any renewal term within six months of the beginning of the last year of the Initial Term or a renewal term (the "Current Term"), this Agreement will be terminated six months from the last day of the Current Term. During this six month period, the Owner shall pay the Annual Price paid for the last year of the Current Term, as indicated above, pro-rated over the six month period.



**Section 4. 4 - Payment of the Annual Price**

The Owner shall pay PUC Services the Annual Price for each year of the Initial Term or any Current Term, in twelve monthly payments, in advance, on the first day of each month. Payment may be made by the Owner by pre-authorized bank debit from a bank account designated by the Owner or by payment upon receipt of invoice. In Year One of the Initial Term, the monthly payment of the Annual Price shall be             The first payment shall be due and payable on July 1, 2003 and available in the Owner's designated bank account on that date.

**Section 4. 5 - Items not included in the Annual Price**

The Annual Price, for each year of the Initial Term and any subsequent term, covers all charges for the Services, but does not cover items or matters that are outside the scope of the Services, and without restricting the generality of the foregoing, does not include the following:

(a) any Capital Expenditures as agreed to by the Owner, or resulting from any failure of the Owner to implement reasonably recommended Capital Expenditures;

(b) any charges resulting from any changes in Services required by changes to Applicable Laws;

(c) Unexpected Expenses (as defined in Paragraph 4.7(a) below);

(d) the payment of municipal taxes or municipal grants in lieu of taxes; and

(e) any charges resulting from adverse tax changes in respect of the Services or the Facility, excluding income taxes payable by PUC Services on its own revenues.

(f) any charges resulting from PUC Services having to address an Uncontrollable Circumstances and, without limiting the generality of the foregoing, such charges resulting from those situations addressed in Section 2.2 of this Agreement.

(g) any charges for utilities including hydroelectric power, natural gas and water.

**Section 4. 6 - Capital Expenditures**

(a) "Capital Expenditures" means the charges for all capital items in relation to the Facility, including new or replacement equipment, any overhaul or rebuild of equipment, any non-routine repair or maintenance, (excluding routine maintenance); any alterations and any associated installations, commissioning, including labour and preselection "charges, together with PUC Services' service fee.

(b) No later than October 31st of each year this Agreement is in force, or a date as the parties may agree in writing, PUC Services will provide the Owner with an estimate of the Capital Expenditures reasonably required for the operation of the Facility for the following year. The Owner's written approval of any estimate authorizes PUC Services to incur the Capital Expenditures included in the estimate (the "Approved Capital Expenditures").

(c) PUC Services will invoice the Owner for the Approved Capital Expenditures together with any additional supporting documentation and the Owner shall pay the invoice within 30 days of receipt.

**Section 4. 7 - Unexpected Expenses**

(a) "Unexpected Expenses" means unanticipated expenditures that PUC Services reasonably incurs in order to address equipment failure, acts of third parties, or other circumstances beyond PUC Services' reasonable control, including but not limited to unregulated septic dumping, illegal industrial waste discharges or overflows, any emergency situation or any situation resulting from an Uncontrollable Circumstance.

(b) In the event that PUC Services is required to incur Unexpected Expenses, the prior approval of the Owner with respect to those Unexpected Expenses will be required only if time permits. Within ten days of incurring the Unexpected Expenses, PUC Services will provide the Owner with a report detailing the reasons the Unexpected Expenses were incurred and the Owner shall pay PUC Services for the Unexpected Expenses within thirty (30) days of receipt of an invoice from PUC Services.



### Section 4. 8 - Interest on Late Payments

If the Owner's monthly payment of the Annual Price is not available in its designated bank account on the agreed to date of payment, or if a certified cheque payable to PUC Services has not been received, PUC Services will notify the Owner that the funds were not available. On the next Business Day, PUC Services will again attempt to withdraw the monthly payment. If funds are not available when the second attempt to withdraw funds is made, PUC Services will notify the Owner that the payment is late, and in addition to paying the monthly payment owing to PUC Services, the Owner shall pay PUC Services interest at that rate determined by PUC Inc., from time to time, as payable on overdue accounts, in accordance with the Financial Administration Act plus any banking and administrative charges.

### Section 4. 9 - Partial Payment of Disputed Invoices

If the Owner disputes any portion of an invoice, the Owner shall nonetheless pay to PUC Services the undisputed portion of the invoice by the due date. If any additional amount is finally determined to be payable to PUC Services, the Owner shall pay PUC Services the additional amount, plus interest as provided in Paragraph 4.8 above, within ten days from the date of final determination.

## ARTICLE 5 - DISPUTE RESOLUTION

### Section 5. 1 - Arbitration

(a) If a dispute arises between the Owner and PUC Services which cannot be resolved within a reasonable time, the issue shall be determined by a sole arbitrator appointed by mutual agreement between the Owner and PUC Services.

(b) Failing agreement, the issue shall be determined by a panel of three arbitrators: one arbitrator shall be appointed by the Owner and a second arbitrator shall be appointed by PUC Services. These two arbitrators shall appoint a third, who shall chair the arbitration. The determination of the sole arbitrator or the arbitration panel, as applicable, shall be final and binding upon PUC Services and the Owner and there shall be no appeal from the determination.

(c) The arbitration shall be governed by the provisions of the Arbitrations Act.

(d) The fees and expenses of the arbitrator(s) shall be borne equally between the Parties.

## ARTICLE 6 - EXISTING AGREEMENTS AND TERMINATION

### Section 6. 1 - Termination of Agreement

(a) At least twelve calendar months before the expiry of the Initial Term, or any Renewal Term, either party may notify the other in writing whether it wishes to terminate this Agreement at the end of the Initial Term or any Renewal Term. If no notice is given as required by this section or the parties do not otherwise agree in writing then the Agreement shall renew for a further five year period ("Renewal Term").

(b) During the Initial Term or any Renewal Term, this Agreement may be terminated by either the Owner or PUC Services ("termination for Cause") if:

    (i) there has been a material breach of the Agreement; and

    (ii) the party complaining of the breach has given written notice of the breach to the other party; and

    (iii) the other party does not correct the breach within thirty days of receiving the notice.

    (iv) After the thirty days referred to in paragraph (iii) above has expired, the party complaining of the breach gives the other party six months written notice of termination.

(c) If either Party disputes the existence of a breach or that the breach is material, the dispute may be referred to arbitration under Section 5.1 of this Agreement.



(d) After the Initial Term, either the Owner or PUC Services may terminate this Agreement as follows:

    (i) in accordance with Section 4.3;

    (ii) for any reason, upon twelve months prior written notice; or

    (iii) if there has been a material breach of the Agreement, in accordance with the procedures described in Paragraph 6.1(b) above.

### Section 6.2 - Early Termination

(a) Subject to paragraphs (b) and(c) below, the Owner shall be entitled to terminate this Agreement for any reason prior to the expiry of the Initial Term, on a six months prior written notice to PUC Services.

(b) The Owner acknowledges that PUC Services is able to offer the Annual Price because of long term agreements PUC Services enters into with suppliers and other third parties. If the Owner terminates this Agreement early pursuant to paragraph (a) above, the Owner shall:

    (i) assume for the duration of the Initial Term, any contractual obligations that PUC Services may have made with respect to the Facility or in connection with this Agreement for the supply of services, products or materials, including but not limited to any obligations to suppliers and sludge haulers, or the Owner shall compensate PUC Services for any costs, expenses and losses incurred by PUC Services in terminating this Agreement. Such costs, expenses and losses shall not include any claim for severance packages for employees or loss of profit.

    (ii) pay PUC Services a reasonable price for any equipment at the Facility purchased by PUC Services (and not paid for by the Owner) in order to make operations at the Facility more efficient.

(c) If the Owner terminates this Agreement pursuant to paragraph (a) above, the last day on which PUC Services shall operate the Facility shall fall on the last day of a calendar quarter.

### Section 6.3 - Inventory Count of Consumables/Supplies

PUC Services and the Owner will conduct an inventory count of consumables/supplies at the Facility on the first day of the Initial Term, or as soon as the parties may agree on. Upon termination of this Agreement, PUC Services shall either:

(a) ensure that there is the same amount of consumables/supplies at the Facility on the date of termination as there was on the first day of the Initial Term; or

(b) reimburse the Owner for any shortfall.

If the amount of consumables/supplies at the Facility on the date of termination exceeds the amount on the first day of the Initial Term, the Owner will either reimburse PUC Services for any excess or PUC Services may take possession of any excess, as PUC Services may determine.

### Section 6.4 - Final Settlement

If PUC Services ceases to operate and maintain the Facility, there shall be a final settlement of all accounts with respect to the Annual Price and any other expenses incurred by PUC Services and amounts owing by or to the Owner under this Agreement and any Existing Agreement including, but not limited to the outstanding debt, if any, owed to PUC Services, no later than ninety days after PUC Services ceases to provide the Services.

## ARTICLE 7 - INNOVATIONS

### Section 7.1 - Innovations

Either Party may bring forward innovative ideas for the operation of the Facility and both parties agree to reasonably consider such innovative ideas



## ARTICLE 8 - GENERAL

### Section 8.1 - Ownership of Technology

The Owner acknowledges and agrees that in providing the Services, PUC Services may utilize certain technology developed by or for PUC Services, whether existing now or in the future, including but not limited to technology such as WMS, and PCD (the "Technology"). The Owner further agrees that the use of the Technology at the Facility does not in any way give the Owner any ownership rights in or Intellectual Property Rights to, the Technology.

### Section 8.2 - Headings

The division of this Agreement into Articles, Sections and Paragraphs and the insertion of headings are for convenience of reference only and will not affect the construction or interpretation of this Agreement.

### Section 8.3 - Entire Agreement

This Agreement constitutes the entire agreement between the Owner and PUC Services with respect to the subject matter hereof and cancels and supersedes any prior understandings, undertakings, representations, warranties, terms, conditions and agreements, whether collateral, express, implied or statutory, between the Owner and PUC Services with respect thereto.

### Section 8.4 - Amendments and Waivers

No amendment to this Agreement will be valid or binding unless it is in writing and duly executed by both of the parties hereto. All amendments shall be attached to this Agreement as a Schedule. No waiver of any breach of any provision of this Agreement will be effective or binding unless it is in writing and signed by the party purporting to give such waiver and, unless otherwise provided, will be limited to the specific breach waived.

### Section 8.5 - Successors and Assigns

This Agreement shall operate to the benefit of and be binding upon, the parties hereto and their successors and assigns. This Agreement may be assigned in the discretion of either party.

### Section 8.6 - Survival

All representations, warranties and indemnities given by each of the parties, shall survive indefinitely the termination of this Agreement.

### Section 8.7 - Severability

If any covenant, obligation or provision hereof or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remaining provisions or the application of each provision to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby and shall continue to be valid and enforceable.

### Section 8.8 - Notices

(a)   Any notice, or other communication required or permitted to be given hereunder by either party to this Agreement shall be in writing and shall be delivered in person, transmitted by fax or sent by registered mail, addressed as follows:

   (i)   if to the Owner:

   City of Sault Ste. Marie, Engineering and Planning Department
   P.O. Box 580, 99 Foster Drive, Sault Ste. Marie, ON   P6A 5N1
   Telephone: (705) 759-5329         Fax: (705) 541-7165
   Attention:   Don Elliott, Environmental/Construction Engineer

   (ii)   if to PUC Services:

   PUC Services Inc.
   P.O. Box 9000, 765 Queen Street East, Sault Ste. Marie, ON   P6A 6P2
   Telephone: (705) 759-6552         Fax: (705) 759-6534
   Attention:   Dominic Parrella, V.P. Operations and Engineering



(b) If delivered in person or transmitted by fax, any such notice or other communication shall be deemed to have been given and received on the day on which it was delivered or transmitted (or, if such day is not a Business Day, on the next following Business Day).

(c) If mailed, any such notice or other communication shall be deemed to have been given and received on the third Business Day following the date of mailing; provided, however, that if at the time of mailing or within three Business Days afterwards a labour dispute or other event occurs, which might reasonably be expected to disrupt the delivery of documents by mail, any notice or other communication hereunder shall be delivered or transmitted by fax as provided in this Section 8.8.

(d) A party to this Agreement may change its address for the purpose of this Section by giving the other party notice of such change of address in the manner provided in this Section.

### Section 8. 9 - Counterparts

This Agreement may be executed in counterparts, each of which shall constitute an original and all of which taken together shall constitute one and the same instrument.

### Section 8. 10 - Freedom of Information

The Owner understands and agrees that this Agreement and any materials or information provided to PUC Services through the performance of the Services may be subject to the Freedom of Information and Protection of Privacy Act, R.S.O., 1990, C-F, 31, as amended.

IN WITNESS WHEREOF the parties have duly executed this Agreement.

PUC SERVICES INC.

_____          By: _____
Date of Signing                                    Brian Curran, President & CEO

_____          By: _____
Date of Signing                                    Terry Greco, Treasurer

THE CORPORATION OF THE CITY OF
SAULT STE. MARIE

2003  06  23                                     By: _____
Date of Signing                                    John Rowswell, Mayor

2003  06  23                                     By: _____
Date of Signing                                    Donna Irving, City Clerk



## SCHEDULE A

### The Facility

**Part I. Description of the Facility**

For the purposes of this Agreement, the Facility is comprised of the following:

### West End Plant

The West End Plant is a 20,000 cubic meter per day conventional activated sludge wastewater treatment plant. The plant includes two lift stations, mechanical bar screens, two vortex grit removal units and two primary clarifiers with scum removal equipment. Secondary treatment is provided by four aeration cells with fine bubble diffusers and two secondary clarifiers as per the Certificate of Approval. The plant has a sludge dewatering system consisting of two diaphragm sludge transfer pumps, two gorators, three single piston positive displacement pumps (Willett) and two 1200 mm plate and frame sludge presses.

### Lift Stations

There are two large and one smaller screw pumps at each station. The smaller pump is used as the duty pump with the larger ones as standby. The pumps are of axial, high lift flow design operating on a start/stop operation cycle. The daily pumping capacity of the lift station is 410,000 cu.m./day, the two large pumps each with a capacity of 190,000 cu.m./d, and the smaller one with a capacity of 30,000 cu.m./d. The lift stations are each equipped with a permanent standby diesel generator. The Intermediate pump station, located at 800 Young Street, produces 300 Kilowatts and will operate all equipment. The Main pump station generator, located at 55 Allen's Side Road, produces 400 Kilowatts and operates all lift station equipment as well as the Control Room in the administration building which contains the alarm system.

### Primary Overview

The screening and degritting building contains two mechanically operated bar screens and one manually cleaned screen for emergency purposes. Rags, sticks and other material collect on these screens and are transferred to a disposal bin via a screw conveyor. Two vortex grit removal tanks allow the collection of inorganic material, which is transferred to the waste bin via a belt conveyor for disposal at the City's landfill site. The West End Plant primary sedimentation includes 2 tanks with a total capacity of 2,904 cu.m. allowing for 6.5 hours of detention time under average flow conditions. The primary clarifier tanks are both 44m x 11m x 3m, 1,452 cu.m. in size. Slide gates allow inlet flow control. Travelling bridges direct the settled solids into 4 hoppers with diaphragm pumps for solids removal. Surface scum is removed with a cross collector system and deposited in tanks for disposal at landfill.

### Biological Overview

The West End Plant biological process includes 4 tanks with a total capacity of 4,600 cu.m. for approx. 5.5 hours detention time under average flow conditions. Each tank is 30m x 15m x 5m, or 1,160 cu.m. in size. There are 4 blowers located in the Blower Building, which can deliver up to 1,425 cu.m./hr air volume to provide the oxygen necessary for the micro-organisms.

### Secondary Overview

West End Plant secondary sedimentation system includes 2 clarifiers with a total capacity of 5,090 cu.m. providing approx. 5.8 hours of detention time under average flow conditions. Each final clarifier tank is 30m diameter x 3.6m, for a capacity of 2,545 cu.m.

### Disinfection- Effluent Disposal Overview

Chlorine gas stored in the Chlorine Building is used in the chlorination process of the final effluent. The average volume of treated effluent to be disposed of is 10,500 cu.m./d and is directed into the St Mary's River after the final treatment stage via a 2 km outfall.

### Solids Handling Overview

The sludge dewatering process produces a solids mass that is greater than 25% solids. This facility incorporates plate presses for dewatering purposes. The total volume treated by this process is 1,520 cu.m./month. Anionic polymers are applied at the Willett pumps to assist in the removal of water. The total volume of sludge produced per annum requiring disposal is 1,900,000 kg of dewatered cake hauled in 2,500 cu.m. loads via tractor-trailers.



### East End Plant

The East End plant is a primary plant with chemical phosphate removal, designed for a total flow of 54,550 cu.m./d. Upgrades were made in 1987 to incorporate Phosphate removal via the addition of aluminum sulphate and polymer, as well as improved sludge dewatering quality and quantity with the addition of Plate Presses. Approximately two thirds of the cities' sewage is collected by several pumping stations and directed to the East End plant. This flow is collected from the east area of the city, as well as the central area and the west, up to and including the Peoples Road area. The plant includes three lift stations, influent monitoring, mechanical bar screens, degritters, and six clarifiers with scum removal.

### Influent Works

As the influent enters the head of the plant, the flow is split to A and B plants, usually at a ratio of 4:1. Aluminum Sulphate is added to each of the two flow streams, then the flows are metered in the parallel parshall flumes. The alum is paced to flow based upon the meter readings. When high flows occur, usually due to runoff, the alum feed is automatically switched to manual settings.

### Screening and Degritting

The first physical process in the treatment takes place in the detritor buildings, where the flow passes through mechanical bar screens and then the grit removal system (detritors and grit rakes). The screens collect and remove rags, sticks and other large objects to a belt conveyor, which transports them to a storage bin.

The detritors reduce the velocity of the flow, allowing grit, sand, gravel and silty material to settle out (inorganic). A revolving collector mechanism at the bottom of the detritor draws the settled material to a sump from which a reciprocating rake lifts the material to a conveyor for transportation to a storage bin. The rake channel is equipped with two organic return pumps that return suspended organic material back into the flow. The accumulated rags and grit are hauled to the city landfill site.

At the discharge of the detritors a predetermined dosage of polymer is added, based on the flow measured at the parshall flumes.

### Primary Sedimentation Tank

From the detritor, the flow is discharged via a distribution chamber to the primary sedimentation tanks (also known as clarifiers). Here, the flow rate is reduced to allow heavier solids to settle to the bottom of the tanks. The alum and polymer additions result in floc by joining solids, causing them to settle in the clarifiers rather than flow untreated (unaffected) through the plant. This floc contains the phosphorous that has reacted with the alum, as well as the particles of solids typically left behind with normal primary treatment, reducing the total phosphorous to <1.0 mg/l during optimum treatment.

The settled solids (or sludge) is collected by revolving mechanical scrapers, to the centre of the clarifier where it is pumped by diaphragm pumps to holding tanks at the detwatering building. The scum that collects on the surface of the settling tanks is removed by skimmer mechanisms and deposited into a scum pit. This scum is pumped off the bottom to the sludge holding tanks, from where it is hauled to landfill by vacuum trucks.

### Chlorine Contact Chamber

The effluent from the primary tanks, with > 70% of the suspended solids removed, flows by gravity to the chlorine contact chamber. Chlorine is added at this point and, following a twenty minute detention time in the chamber is discharged via a 54 inch outfall sewer to the St. Mary's River with a 0.5 mg/l chlorine residual. Any process bypass within the plant flows through the chlorine contact chamber for disinfection.



#### Dewatering

The chemically treated sludge collected by the primary settling tanks is dewatered by use of two plate presses. To operate these units efficiently, they must have a sufficient supply of sludge and polymer to fill the press. Optimal process operation is to keep sludge in the primary clarifers to a minimum, therefore, sludge holding tanks are mixed to prevent the sludge from separating or becoming septic before pressing.

Immediately before entering the press, the sludge is preconditioned (mixed) with a polymer coagulant that assists in releasing the water and bonding the solids into a floc. The dewatered sludge or press cake is discharged to a trailer for haulage to the city landfill site.

**Part 2. Street Address of the Facility**

The street address of the Facility is as follows:

| | |
|---|---|
| West End Plant | 55 Allen's Side Road, Sault Ste. Marie, ON |
| Main Lift Station (West End) | 55 Allen's Side Road, Sault Ste. Marie, ON |
| Intermediate Lift Station (West End) | 800 Young Street, Sault Ste. Marie, ON |
| East End Plant | 2221 Queen St. E., Sault Ste. Marie, ON |
| River Road Station (East End) | 79 River Road, Sault Ste. Marie, ON |
| Clark Creek Station (East End) | 1677 Queen Street E., Sault Ste. Marie, ON |
| Pim St. Station (East End) | 816 Bay Street, Sault Ste. Marie. ON |



## SCHEDULE B

### Definitions

In this agreement, the following terms are defined below or in the section in which they first appear:

"**Agreement**" means this agreement together with Schedules A, B, C, D and E attached hereto and all amendments made hereto by written agreement between PUC Services and the Owner.

"**Annual Price**" is defined in Paragraph 4.2(a) of this Agreement.

"**Applicable Laws**" is to be broadly interpreted and means, with respect to any person, property, transaction, event or other matter dealt with in this Agreement, any and all statutes, by-laws, regulations, enactments, ordinances, rules, permits, consents, approvals, certificates of approval, licenses, judgements, orders, judicial decisions, common-law rules, decrees, injunctions, agreements, authorizations, regulations, policies, directives, objectives, whether federal, provincial or municipal including, but not limited to all laws relating to occupational health and safety matters, fire prevention and protection, health protection and promotion, land use planning, environment, Building Code, or workers' compensation matters.

"**Approved Capital Expenditures**" is defined in Paragraph 4.6(b) of this Agreement.

"**Authorizations**" means each of the sewer use and water by-laws, licences, certificates of approval, permits, consents and other authorizations or approvals required under any Applicable Law from time to time in order to operate the Facility.

"**Authorized Representatives**" is defined in Section 2.5 of this Agreement.

"**Business Day**" means a day other than a Saturday, Sunday or statutory holiday in Ontario.

"**Capital Expenditures**" is defined in Paragraph 4.6(a) of this Agreement.

"**Claim**" means any claim, fine, penalty, liability, damages, loss and judgements (including but not limited to, costs and expenses incidental thereto) of any kind and nature whatsoever.

"**Current Term**" is defined in Section 4.3 of this Agreement.

"**Excluded Services**" is defined in Section 2.3 of this Agreement.

"**Facility**" is defined in Paragraph (c) of the Recitals to the Agreement and described in Schedule "A".

"**Indemnified Parties**" is defined in Section 3.3 of this Agreement.

"**Initial Term**" is defined in Section 4.1 of this Agreement.

"**Insurance**" is defined in Paragraph 2.9(a) and further described in Schedule E.

"**Intellectual Property Rights**" means any copyright, trademark, patent, registered design, design right, topography right, service mark, application to register any of the aforementioned rights, trade secret, rights in unpatented know-how, right of confidence and any other intellectual or industrial property rights of any nature whatsoever in any part of the world.

"**Parties**" is defined in Paragraph (d) of the Recitals to the Agreement.

"**PCD**" or "**Process Control Data**" means technology that allows process data to be entered into a format that can be viewed, manipulated and retrieved in the form of customized reports.

"**Renewal Term**" is defined in Paragraph 6.1(a) of this Agreement.

"**Services**" is defined in Section 2.1 and further described in Schedule C to this Agreement.

"**Technology**" is defined in Section 8.1 of this Agreement.

"**Termination for Cause**" is defined in Paragraph 6.1(b) of this Agreement.

"**Uncontrollable Circumstance**" is defined in Paragraph 2.2(c) of this Agreement.

"**Unexpected Expenses**" is defined in Paragraph 4.7(a) of this Agreement.

"**WMS**" or "**Work Management System**" means a computer program used to schedule a program of preventive maintenance activities for equipment in a facility.



## SCHEDULE C

### The Services

Subject to the provisions of this Agreement the Services are those services specifically set out in this Schedule. Specifically, PUC Services will provide services relating to Schedule "A" as follows:

1. **Process Operations**

    PUC Services, acting reasonably, is responsible for ensuring an efficient operation of the process and keeping records on a daily basis by:

    - inspecting process control equipment to ensure proper operation of primary and secondary wastewater treatment clarifiers, pumps, blower and aeration systems, alum and other chemical feeders;
    - checking pumping stations for proper operation and taking routine readings;
    - operating pump controls and valve controls for pumping of all process streams;
    - operating detritor systems, sludge pumping and dewatering systems, aeration systems and chlorination systems;
    - operating scum collection equipment and pumping out scum collection chambers;
    - raking bar screens and check comminutors and mechanical bar screens;
    - hosing down weirs, walls and channels in aeration tanks, clarifier, and detritor equipment;
    - mixing and monitoring process chemicals such as chlorine, alum and polymer;
    - recording and analyzing wastewater flow, chemicals used, chlorine residuals, process water and wastewater flow calculations;
    - sounding clarifier for sludge depth to ensure proper return rates;
    - checking chemical feed pumps and return sludge rates, comparing to routine calculations and determining operational adjustment requirements;
    - calculating, recording, and analyzing the amount of wastewater treated, the daily flows and monthly flows, pumping station running hours, diesel running hours, amount of chlorine and chemicals used, and the sludge hauled;
    - performing routine wastewater tests such as suspended solids, BOD, total solids, chlorine residual, dissolved oxygen, total phosphorus, temperature, 30 minute settling and recording results, calculating plant process control parameters and making operational adjustments as required such as increasing chemical feed or wasting return sludge;
    - operating the plate press system to efficiently produce a dewatered sludge that can be safely hauled away for further treatment or disposal at the Owner's landfill site;
    - on a routine basis, completing the daily operating forms for statistics for computer input and correcting the results of the output forms to ensure a proper monitoring of plant flows and process for wastewater treatment;
    - collecting samples for heavy metals and trace organics, conducting routine analysis for coliform bacteria and chemicals and ensuring that they are shipped to the proper labs (samples to ensure a representative analysis);
    - ensuring that the daily operations comply with and fulfill the requirements of the Certificate of Approval and other legal documents;



2. **Routine Maintenance**

   PUC Services will provide routine maintenance of the Facility, as would a reasonable operator. Specifically, PUC Services will:

   - carry out a routine lubrication program including greasing and oiling as specified in the lubrication schedule;
   - perform routine maintenance duties to equipment by following the preventive maintenance procedures as specified by the Work Management System; by checking machinery and electrical equipment when required, overhauling of equipment when necessary; and by replacing filters, belts, hoses, etc. when required;
   - maintain an inventory on all equipment and tools;
   - ensure buildings and grounds are kept in a clean and orderly state including cutting grass, clearing snow and other routine maintenance; and
   - ensure the security of the facility by locking doors and gates.

3. **Capital Improvements**

   PUC Services, acting as a reasonable operator, will record information on the frequency of equipment breakdown and repair costs to determine replacements needs. Where reasonable, parts of the Facility requiring upgrading or improvement will be identified and brought to the attention of the Owner in accordance with Paragraph 4.6(b) of this Agreement.

4. **Optimization**

   PUC Services will routinely analyze, investigate and, where appropriate, implement measures to improve the effectiveness and efficiency of the Facility.

5. **Regulatory Matters**

   PUC Services will handle day-to-day regulatory requirements and contacts with regulatory authorities in respect of operating issues concerning the Facility. PUC Services will review any inspection reports prepared by regulatory authorities that are provided to PUC Services. Subject to any approvals of the Owner required by Paragraph 4.6(b) of this Agreement, PUC Services will either correct deficiencies identified in such inspection reports or negotiate changes to the reports with the regulatory authorities.

6. **Staffing**

   As appropriate, PUC Services will staff the Facility with certified operators and other trained staff as required by regulation under the Ontario Water Resources Act. All PUC Services staff at the Facility will be trained for the normal process operation and maintenance of the Facility and will also receive training on how to deal with emergency situations. PUC Services staff will be available to provide 24-hour coverage at the Facility in the event of illness or emergencies.

7. **Emergency Situations**

   PUC Services will ensure that the Facility has a contingency plan in place to deal with non-routine operational situations and emergency situations such as spills, by-passes, overflows, hydro interruptions and equipment failure.



## SCHEDULE D

### Excluded Services

Services that will <u>not</u> be provided by PUC Services include but are not limited to, the following ("Excluded Services"):

- installation and/or inspection of new water and sewer services;
- high pressure sewer flushing;
- cost for non-routine sampling and lab analysis;
- monitoring and repairs to West End Plant dumping station for recreational vehicles and septic tank haulers;
- utility costs including hydro electric, natural gas and water;
- landscaping at all sewage lift stations and plants;
- Operations and maintenance services for the new John Street pumping station and the Bellevue Park CSO tank.

These "Excluded Services" can be provided by PUC Services subject to section 2.3 of the Agreement.



## SCHEDULE E

### Insurance

A summary of the insurance coverage based on industry standards that PUC Services will arrange for in respect of the Facility is described below:

**Property Insurance**

**Perils:** "All Risks" including earthquake and flood, subject to policy exclusions.

**Limits:** Replacement Cost Coverage

**Deductibles:** For the year 2003, subject to change on annual basis:

| | |
|---|---|
| All Perils: | $2,500 except earthquake and flood |
| Earthquake: | $50,000 (minimum) |
| Flood: | $25,000 |

Where the Owner's property is repaired or replaced the Owner will pay the deductible. Where PUC Services' property is repaired or replaced, PUC Services will pay the deductible. In cases where both the Owner's and PUC Services' property is repaired or replaced, the deductible will be paid by both the Owner and PUC Services prorated in accordance with the total loss.

**Property Insured:** All reported properties including buildings, contents and equipment. Includes pumping stations, excludes underground sewer and water system.

**Boiler and Machinery Insurance**

**Coverage:** Insures against loss or damage arising from an accident to scheduled object in use or connected ready for use. This insurance also provides for inspection and certification services as required by law.

**Objects:** Boilers, pressure vessels (excess of 15PSI) and piping.

**Accident:** Sudden and accidental mechanical breakdown of an object, which causes it physical damage, requiring its repair or replacement. Subject to policy exclusions.

**Limit:** $60,000,000 per loss.

**Deductibles:** $2,500 for the year 2003; subject to change on annual basis:

Where the Owner's property is repaired or replaced the Owner will pay the deductible. Where PUC Services' property is repaired or replaced, PUC Services will pay the deductible. In cases where both the Owner's and PUC Services' property is repaired or replaced, the deductible will be paid by both the Owner and PUC Services prorated in accordance with the total loss.

**Comprehensive Liability Insurance**

**Coverage:** 1. Automobile liability including Collision and Comprehensive

2. Third party liability including legal fees, for property damage and/or bodily injury as caused by negligence arising out of all operations of the insured.

3. Environmental Impairment liability covering property damage and personal injury and clean up costs for pollution conditions arising out of Operations Covered, which has caused or will cause Environmental Impairment.



| | |
|---|---|
| **Limit:** | 1. Automobile: $15,000,000. Accident benefits per Ontario Statutes |
| | 2. Third Party: $20,000,000 per Accident, Event, Occurrence, or Wrongful Act. |
| | 3. Environmental: $20,000,000 per Accident, Event, Occurrence, or Wrongful Act. |
| **Deductible:** | 1. Automobile: The deductible will be paid by PUC Services. |
| | 2. Third Party: $10,000 for the year 2003; subject to change on an annual basis |
| | 3. Environmental: $50,000 for the year 2003; subject to change on an annual basis. |

Where PUC Services is negligent the deductible will be paid by PUC Services. Where the Owner is negligent, the deductible will be paid by the Owner. In cases where both PUC Services and the Owner are negligent the deductible will be divided equally.

Where neither the Owner nor PUC Services is negligent the deductible will be paid as follows:

- Where the Owner's property is repaired or replaced the Owner will pay the deductible.
- Where PUC Services' property is repaired or replaced, PUC Services will pay the deductible.
- In cases where the Owner's and PUC Services' and/or a third party's property is repaired or replaced, the deductible will be paid by both the Owner and PUC Services pro rata in accordance with the total loss.