UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

WELCH, et al

                    Plaintiffs,
                                                          Hon. Gordon J. Quist

v                                                         2:06-cv-230

PUC SERVICES, INC., an Ontario Corporation,

                    Defendant
_____/

and

BEAN, et al

                    Plaintiffs,
                                                          Hon. Gordon J. Quist

                                                          2:08-cv-158

v

PUC SERVICES, INC., an Ontario Corporation,

                    Defendant
_____/

| | |
|---|---|
| Anthony J. Garczynski (P47146) | M. Sean Fosmire (P31737) |
| Attorneys for Plaintiffs | Attorney for Defendant |
| 771 North Mill Street | 1440 West Ridge Street |
| Plymouth, MI 48170-1423 | Marquette, Michigan 49855 |
| Telephone: (734) 404-2425 | Telephone:  (906) 226-2524 |

## SECOND MOTION FOR SUMMARY JUDGMENT

Defendant PUC Services, Inc., by its attorneys Garan Lucow Miller, P.C., moves that

this Court issue an Order granting summary disposition as to certain counts and certain

allegations made in the Complaint, under the provisions of Rule 56 of the Federal Rules of

Civil Procedure, and in support thereof states:

1.    This litigation involves the operation of the East End Water Pollution Control Plant located in the City of Sault Ste. Marie, Ontario.

2.    The East End Plant, by design, discharges its effluent into the Lake George Channel of the St. Mary's River.

3.    The plaintiffs in this case are residents of Sugar Island who own land located on the Lake George Channel of the St. Mary's River (western and north shores of Sugar Island) or on Lake George, a body of water which is downstream from that location (northeast shores of the island).

4.    The claims made by the plaintiffs are based on alternative theories of liability, including negligence, nuisance, and trespass.

5.    The operative allegation of the plaintiffs' complaints is that the defendant, as the operator of the East End plant from June 2005 forward, "released untreated or improperly treated waste of human origin" into the Lake George Channel of the St. Mary's River.

6.    The anecdotal reports that have been revealed in the course of investigation and discovery in this case have described "floating materials", sometimes having the appearance of human waste, seen floating on the surface of the water and occasionally seen in boat slips and on beaches, as well as identifiable physical objects such as condoms and tampon applicators which have occasionally been found on the shore. The plaintiffs claim that these materials were released from the East End plant. Although that claim is denied by the defendant – indeed, that controversy is the central issue in this litigation – it must be accepted as true for the purpose of this Motion.

7.      In addition, the plaintiffs have referenced surface water testing that was done in 2006 to look for the presence of *E. coli*, a species of bacteria, as a marker of bacterial contamination of the water. Such microorganisms are not visible to the human eye but are sometimes associated with materials that are visible. The plaintiffs claim that these microorganisms were released as a result of improper treatment of wastewater at the East End plant. Again, this is a claim that is denied but which must be accepted as true for the purpose of this Motion.

8.      There is no genuine issue of material fact between the parties as to the facts on which this motion is based.

9.      Defendant is entitled to summary judgment as to Counts II, V, and VI of the Second Amended Complaint in *Welch*, and Counts II, V, and IX of the Complaint filed in the *Bean* case, on those undisputed facts.

FOR THESE REASONS, the defendant requests that the Court grant summary judgment in its favor as to the referenced counts.

**GARAN LUCOW MILLER, P.C.**
Attorneys for Defendant

_____/s/_____
__

Date:  April 22, 2009

**M. Sean Fosmire (P31737)**
1440 West Ridge Street
Marquette, Michigan 49855
(906) 226-2524
sfosmire@garanlucow.com

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

WELCH, et al

                    Plaintiffs,
                                                          Hon. Gordon J. Quist

v
                                                          2:06-cv-230

PUC SERVICES, INC., an Ontario Corporation,

                    Defendant
_____/

and

BEAN, et al

                    Plaintiffs,
                                                          Hon. Gordon J. Quist

                                                          2:08-cv-158

v

PUC SERVICES, INC., an Ontario Corporation,

                    Defendant
_____/

Anthony J. Garczynski (P47146)                M. Sean Fosmire (P31737)
Attorneys for Plaintiffs                      Attorney for Defendant
771 North Mill Street                         1440 West Ridge Street
Plymouth, MI 48170-1423                       Marquette, Michigan 49855
Telephone: (734) 404-2425                     Telephone:  (906) 226-2524

**BRIEF IN SUPPORT OF SECOND MOTION FOR SUMMARY JUDGMENT**

Some of the counts that are pleaded in the two Complaints at issue in this case raise claims that are not properly applicable to the undisputed facts of this case, as developed in the course of discovery and document exchange under Rule 26(a). Two of the four nuisance counts and the count alleging trespass do not "fit" the pattern of facts and events.

The undisputed facts that underlie this motion are fairly general rather than specific. They are established by:

1.  A description of the general processes and goals that are involved in wastewater treatment - Affidavit of Michael Smith [Exhibit 4]

2.  A brief historical description of the East End plant, taken from the Pre-Design Report prepared by EarthTech in 2003. (Admissible by stipulation of the parties, and also attached as exhibit to the deposition of John Myatt of EarthTech) [Exhibit 5]

3.  Another brief historical description, as taken from Sections 2.1 to 2.2 of the Pre-Engineering Report prepared by William Walker Engineering of Sault Ste. Marie, Ontario, done in 2002 to survey and describe the shortcomings of the old plant in preparation for design of an upgrade. (Admissible by stipulation of the parties) [Exhibit 6]

Some additional facts are recited at the introduction to the section on trespass claims below.


**Nuisance claims**

The complaints in this case – the First Amended Complaint [Document 64] filed in the Welch case and the Complaint filed in the Bean case [Document 1] – each include four separate counts premised on nuisance. Those counts are, in the order that they appear:

Count II – Nuisance *per se*

Count III – Intentional Nuisance in Fact

Count IV – Negligent Nuisance in Fact

Count V – Public Nuisance

Only Counts III and IV, which are essentially alternatively pleaded variations of the nuisance in fact claim, are properly applicable in this case. Based on the undisputed facts developed in this case, the Court should enter Summary Judgment as to Counts II and V.

Page 2

*Nuisance - the elusive doctrine*

"Nuisance" is defined in Black's Law Dictionary as follows:

> "Nuisance is that activity which arises from unreasonable, unwarranted or unlawful use by a person of his own property, working obstruction or injury to right of another, or to the public, and producing such material annoyance, inconvenience and discomfort that the law will presume resulting damage. . .

> "That which annoys and disturbs one in possession of his property, rendering its ordinary use or occupation physically uncomfortable to him. . .

> "An offensive, annoying, unpleasant, or obnoxious thing or practice; a cause or source of annoyance, especially a continuing or repeated invasion or disturbance of another's right, or anything that works a hurt, inconvenience or damage."

It is the use and enjoyment of the plaintiffs' land which is the hallmark of the concept of private nuisance. A private nuisance is an unlawful interference with a landowner's peaceable use and enjoyment of his land. By contrast, the concept of public nuisance, which gives rise to a claim made by public law enforcement authorities, is not limited to harm to landowners. It has its origin in criminal law.

The most widely used tort textbook in American law schools is that authored by the late Prof. William L. Prosser. Chapter 15 on Nuisance (4th ed., §86) begins with the following language, which is frequently quoted in Michigan cases:

> "There is perhaps no more impenetrable jungle in the entire law than that which surrounds the word 'nuisance'. It has meant all things to all men, and has been applied indiscriminately to everything from an alarming advertisement to a cockroach baked in a pie. There is general agreement that it is incapable of any exact or comprehensive definition."

In the case of *Awad v. McColgan*, 357 Mich 386, 389-390, 98 NW2d 571 (1959), the Michigan Supreme Court similarly said:

> "Nuisance is the great grab bag, the dust bin, of the law. It comprehends interference with an owner's reasonable use and enjoyment of his property by means of smoke, noise, or vibration; the obstruction of private easements and rights of support; interference with public rights, such as free passage along streams and highways, the enjoyment of public parks and places of recreation, and, in addition, activities and structures prohibited as statutory nuisances. . . In short, nuisance. . . 'is a good word to beg a question with. It is so comprehensive a term, and its content is so heterogeneous, that it scarcely does more than state a legal conclusion that for one or another of widely varying reasons the thing stigmatized as a nuisance violates the rights of others.'"

In Michigan jurisprudence, the development of the law of nuisance since 1963 has been strongly influenced (and somewhat distorted) by the fact that it has been applied, in some of its forms, as a judicial exception to the rule of governmental immunity. In part, this development arises from the fact that some activities by governmental agencies which can be regarded as nuisances are analyzed in light of the constitutional prohibition against a governmental agency taking private property without just compensation. As a result, many injury-causing events which would normally form the basis of an ordinary negligence claim in a lawsuit involving private actors have been analyzed under the rubric of nuisance when the defendant was a governmental entity – a fact which does not always make for clear and crisp legal analysis.

Overall, the development of nuisance law in Michigan has involved several dualisms:

- public vs. private nuisance
- nuisance *per se* vs. nuisance in fact

• negligent vs. intentional nuisance in fact

In §86 of his text, Prosser distinguished between public and private nuisance, noting that a "private nuisance is a civil wrong, based on a disturbance of rights in land", and one for which the remedy is a civil action on the part of the person whose rights have been offended. A public nuisance, by contrast, is a type of criminal offense involving interference with the rights of the community at large, and "the normal remedy is in the hands of the state". (See the section on Public Nuisance, below.) An activity which fits the definition of a public nuisance, he notes, can also be a private nuisance.

Michigan cases have adopted Prosser's description of the difference between public and private nuisance, and his observation that the two can overlap. *Hadfield v. Oakland County Drain Commissioner*, 430 Mich. 139, 151-2, 422 N.W.2d 205 (1988).

A common formulation of the differences between the types of private nuisance recognized under Michigan law is that used in *McDowell v. City of Detroit*, 264 Mich App 337; 690 NW2d 513 (2004).[1]

• A nuisance *per se* is an activity or condition which constitutes a nuisance at all times and under all circumstances, without regard to the care with which it is conducted or maintained.  A nuisance *per se* must be unreasonable by its nature rather than predicated on a lack of care.

• A nuisance in fact is a nuisance by reason of the circumstances and surroundings. An act may be a nuisance in fact if its natural tendency is to create danger and inflict injury on person or property. To establish a nuisance in fact, a plaintiff must show significant harm resulting from the defendant's unreasonable interference with the use or enjoyment of the property.

---

[1]    The decision was later reversed on the governmental immunity issue, 477 Mich 1079 (2007), *recon den* 478 Mich 888 (2007), but that ruling did not disturb the description for which it is cited here.

For nuisances in fact, Michigan law also distinguishes between those which are intentional and those which are negligent. As set out in *Wagner v Regency Inn Corp*, 186 Mich App 158, 164; 463 NW2d 450 (1990):

- An intentional nuisance in fact is one the creator intended would create the conditions which constitute the nuisance. To establish intent, a plaintiff must show that when the defendant created or continued the condition which caused the nuisance he knew or must have known that the injury was substantially certain to follow.

- A negligent nuisance in fact is one created by a landowner's negligent acts in violation of a duty owed to the plaintiff.

As we will demonstrate below, the claims asserted by the plaintiffs in these two cases are properly regarded as sounding in nuisance in fact only. The concepts of public nuisance and nuisance *per se* do not properly apply to them, and summary judgment should be granted as to those claims.

## Nuisance *per se*

It is not an understatement to say that the reputation of confusion and impenetrability that shadows the law of nuisance is due, in large part, to the theory of nuisance *per se*. This concept carries forward the ancient common-law formulation of nuisance as a wrong which is actionable without consideration of how carefully it is carried out – that is, without consideration of negligence issues – but it is a mere shadow of what it was in the past.

The following characterization of "nuisance *per se*", from the decision in *Li v Feldt*, 439 Mich 457, 476-477; 487 NW2d 127 (1992)(after second remand), is the one which is most commonly expressed by Michigan courts:

> "A nuisance *per se* is an activity or condition which constitutes a nuisance at all times and under all circumstances, without regard to the care with which it is conducted or maintained. A nuisance *per se* must be unreasonable by its nature rather than predicated on a lack of care."

A nuisance *per se* is based on the pursuit of certain activities on land that are regarded as harmful and objectionable regardless of where they are conducted and regardless of whether the defendant exercises due care. Examples given in old cases and texts include the operation of a bawdy-house or disorderly house, the maintenance of an obstruction in a river or other navigable waterway, the sale of intoxicating liquor where that is illegal, etc. Wood, A Practical Treatise on the Law of Nuisances (1883), §23. [p. 35-36, attached as Exhibit 7].

As Prosser notes in §87 of his text, the historic concept of nuisance *per se* is related to the common law rule imposing strict liability for damage caused by ultrahazardous or abnormal activities. An example of an activity that shares characteristics of both would be a contractor which causes damage to a neighbor's building as a result of blasting activities, or the classic case involving damage done following an unexpected release of an impoundment of water, *Rylands v. Fletcher* (House of Lords, 1868). The decision by the House of Lords to limit the strict liability concept to non-natural uses of land may be the genesis of Prosser's reference to "abnormal activities" in §87.

*History of the concept in Michigan*

The common formulation in the Michigan cases of a nuisance *per se* as one which is a nuisance "at all times and under all circumstances, regardless of the surroundings", derives from an entry in Corpus Juris Secundum, Vol. 66, §3, at pp. 733-734, as quoted originally in

Michigan in the case of *Bluemer v. Saginaw Central Oil and Gas Service, Inc.* 356 Mich. 399,

97 N.W.2d 90 (1959):

> "From the point of view of their nature, nuisances are sometimes classified as nuisances *per se* or at law, and nuisances *per accidens* or in fact. A nuisance at law or a nuisance *per se* is an act, occupation, or structure **which is a nuisance at all times and under any circumstances, regardless of location or surroundings**. Nuisances in fact or *per accidens* are those which **become nuisances by reason of circumstances and surroundings**, and an act may be found to be a nuisance as a matter of fact where the natural tendency of the act is to create danger and inflict injury on person or property. The number of nuisances *per se* is necessarily limited, and by far the greater number of nuisances are nuisances *per accidens*. For this reason whether or not a particular thing or act is a nuisance is generally a question of fact, as discussed infra §8, to be determined in the first instance before the term 'nuisance' can be applied to it.

The concept long predates the CJS entry, however. The 1883 Wood treatise cited

above says, at §23:

> "There are a class of nuisances arising from the use of real property and from one's personal conduct that are nuisances *per se*, irrespective of their results and location, and the existence of which only need to be proved in any locality, whether near to or far removed from cities, towns, or human habitations to bring them within the purview of public nuisances." [See Exhibit 7]

(Note that the older concept of nuisance *per se* that is reflected in the Wood treatise

partook significantly of the law of public nuisance rather than private nuisance.)

The remnant concept of nuisance *per se* which persists in Michigan derives from the

English common law doctrine of nuisance as a strict liability theory. Nuisance in fact is based

on the more modern development of American common law, which applies tort law

considerations of unlawful conduct by the defendant (activity which is intentional or negligent

in character) and the balancing of risks and utility of the conduct of the defendant and the harm to the plaintiff landowner. As we will see below, the clear trend in Michigan law is to limit the scope of the concept of nuisance *per se*, in favor of that of nuisance in fact.

The quoted language from the CJS entry has also been followed on a procedural point in Michigan. Several cases have held it is within the purview of the court to determine, as a matter of law, whether a particular use of land constitutes a nuisance *per se,* since considerations of negligence are not pertinent. By contrast, a jury has to determine if a particular activity gives rise to a nuisance in fact, by determining whether the defendant's actions were properly carried out, and balancing the risks and the utility of the activities in question and the harm to the plaintiff. *Brown v Nichols*, 337 Mich. 684, 689, 60 N.W.2d 907 (1953); *Beard v Michigan*, 106 Mich.App. 121, 124, 308 N.W.2d 185, 186 (1981).

A concept which is procedurally to be determined by the court, rather than by the jury, is a particularly apt ground for a ruling in a Motion for Summary Judgment, as was noted recently by the Eastern District in *Ramik v Darling International*, 161 F. Supp. 2d 772 (E.D. Mich. 2001).

Nuisance *per se*, though often discussed, is rarely found under Michigan law. While the CJS formulation has been repeated in many cases in Michigan, there is only one case in the last several decades in which the court found that a defendant's activities created a nuisance *per se*. That was the case of *Beard v. State of Michigan*, *supra*, involving unexploded hand grenades that had been left behind at a National Guard firing range. (And although the Court found that these explosives constituted a nuisance *per se*, it nonetheless found no liability because the items had been taken off the premises before they exploded and caused injury.)

Although cases such as *Bluemer*, *Li* , et al. regularly recite the language from CJS describing a nuisance *per se* as one which is a nuisance "at all times and under all circumstances, without regard to the care with which they are conducted or the circumstances under which they exist", we find, when we trace the concept back to its origins, that authors and the courts have regularly imported negligence considerations into it.

In the case of *Gerzeski v Department of State Highways*, 403 Mich 149, 168; 268 N.W.2d 525 (1978), the Michigan Supreme Court adopted the following language from Prosser, at §87, in support of its conception of the law of nuisance *per se*:

> "So far as the idea has any validity it apparently is restricted to three types of cases. Certain public nuisances are designated specifically by statute. Within constitutional limitations, the declaration of the legislature is conclusive, and will preclude any inquiry into their unreasonable character. In other cases the defendant is intentionally interfering for his own purposes with the plaintiff's interests, by maintaining something such as a fertilizer plant, a sawmill or a cesspool, which is **clearly an unreasonable thing in view of its surroundings**. When the nature of the enterprise, its locality and the method of conducting it are **reasonable in proportion to the resulting interference**, the same courts have found that the same activity is not a nuisance at all. Finally, nuisances which result from abnormal and unduly hazardous activities, such as the storage of explosives, are said to be 'absolute' in the sense that they do not require any intent to do harm, or any negligence. *[emphasis added]*

A concept which is explained in terms of "unreasonable conduct" and which involves a balancing of the interference with the general utility of the actor's conduct involves issues that typically come under the topic of negligence.

This excerpt indicates that Prosser would characterize as a nuisance *per se* two distinct types of activities:

1.  Ultrahazardous activities which present extreme, unavoidable, and unacceptable hazards to adjoining landowners. The common law's remedy for this has traditionally been the imposition of strict liability for any injuries caused by such activities, without the need to establish negligence.

2.  Other activities undertaken "for [the defendant's] own purposes" whose level of invasiveness or offensiveness is extremely out of balance with the interests of the adjoining landowner, given the location and surroundings in which it is undertaken.

The second of these, however, clearly takes into account the circumstances and the surroundings of the activity in question. Thus, to the extent that Michigan's conception of the law of nuisance *per se* is based on the Prosser analysis, it would only cover the extreme cases of those ultrahazardous activities which are so abnormal and dangerous that the law will impose liability without consideration of negligence. Other nuisances, even those characterized by Prosser as a nuisance *per se* in the quoted language, would be characterized in Michigan as nuisances in fact.

The language used by Prosser is significant for another reason. In the quoted excerpt, Prosser emphasizes the fact that the activity which is recognized as giving rise to a claim based on nuisance *per se* is one which is done by the defendant "for his own purposes," and in which the interference with his neighbors' land is "clearly an unreasonable thing in view of its surroundings." Prosser, and the Michigan Supreme Court in adopting his formulation, recognize that the courts should consider "the general utility of the defendant's conduct" in their nuisance analysis.

*Beneficial public purposes*

Michigan cases, in analyzing the concept of nuisance *per se*, have recognized an important distinction between activities conducted for the actor's own profit and those which have a beneficial public purpose, and have repeatedly declined to find that the latter can present a nuisance *per se*.

In a very old case, Justice Cooley of the Michigan Supreme Court declined to find that the operation of a bobsled ("coasting") on a city street was a nuisance *per se*, despite the risk to horses, on considerations of public utility:

> "If it were unquestioned that coasting upon a public highway was always a nuisance, there would be much plausibility in this contention, and perhaps it should be accepted as sound. . But coasting does not necessarily interfere with the customary use of the street, and might be indulged in with no serious inconvenience to any one. . . On the contrary, as [coasting] itself is healthful and exhilarating, it seems eminently proper, if the street is not put to other public use, that this diversion be allowed, if not expressly sanctioned." *Burford v. Grand Rapids*, 53 Mich. 98, 18 N.W. 571 (1884)

*Li v. Feldt, supra*, also focused on the beneficial public purposes of the activities in question in declining to find a nuisance *per se*:

> "Neither the operation of the traffic light in Li nor the maintenance of the holding pond in Garcia can be said to constitute an intrinsically unreasonable or dangerous activity, without regard for care or circumstances. To the contrary, **both activities serve obvious and beneficial public purposes** and are clearly capable of being conducted in such a way as not to pose any nuisance at all. The very essence of the claims in both Li and Garcia is that the underlying activities became unreasonable and dangerous under the particular circumstances of each case because the defendants allegedly exercised improper or inadequate care. Thus, regardless of whether nuisance per se might qualify as an exception to governmental immunity, neither

Page 12

> *Li* nor *Garcia* presents a colorable claim of nuisance *per se*." 487
> N.W.2d 127 at 137.

In a recent case, *Palmer v Western Michigan University*, 224 Mich App 139, 144, 568 NW2d 359 (1997), the Michigan Court of Appeals rejected plaintiff's request to rule that the placement of a small stop sign in a pedestrian crosswalk constituted a nuisance *per se*. (The complaint by the plaintiff was that the sign was non-standard in color and size and thus that it may have confused the driver who ran over a pedestrian in the marked crosswalk.) The court noted:

> "Rather, the sign, like the improperly timed traffic light in *Li v Feldt*,
> serves a beneficial public purpose, by warning motorists that they
> must stop for crossing pedestrians."

The Court concluded that the placement of the sign could not be regarded as an "intrinsically unreasonable or dangerous activity," and thus was not a nuisance *per se*.

The most recent decision considering the concept of nuisance *per se* under Michigan law is the case of *Ramik v Darling International*, 161 F.Supp.2d 772 (E.D.Mich. 2001). This was a consolidated case involving separate state court actions against the owner and operator of a rendering plant located in Melvindale, Michigan. The cases were removed to Federal Court and were consolidated.

As the Court noted, "rendering" of animal products is "a form of recycling that involves using heat and pressure to reduce dead animals and inedible animal parts from the slaughtering process into ingredients for consumer, medical, and industrial products." The plaintiffs claimed that the defendant's plant emitted noxious odors and pollutants, including air contaminants which were described by neighbors as "the so-called Darling odor."

Page 13

The Court considered all of the factors that underlie the concept of nuisance *per se*:

- "A nuisance per se is 'an activity or condition which constitutes a nuisance at all times and under all circumstances, without regard to the care with which it is conducted or maintained.' [citing *Palmer* and *Li*]
- "The activity in question must be 'an intrinsically unreasonable or dangerous activity, without regard for care or circumstances.' [citing *Li*]
- "If the activity serves a beneficial public purpose and is capable of being performed in a manner so as not to pose any nuisance, then it cannot be considered a nuisance per se. [citing *Palmer*]
- "Because 'the question as to what constitutes a nuisance per se is a question of law for the court...,' it is well-suited for summary judgment." [citing *Beard* and *Brown*]

In addressing the plaintiff's claim that the operation of the plant should be regarded as a nuisance *per se*, the Court noted that a couple of older cases presented situations which "may constitute nuisances *per se*."  The court went on, however, to note:

> "There has been no determination in the case law, however, that just this sort of activity pursued by defendant here constitutes a nuisance *per se*, and **the trend in more recent case law appears to focus on whether an activity is a nuisance in fact**." [emphasis added]

Although the plaintiffs cited a 1926 case in support of an argument that the odor emitted from the processing of dead animals is a nuisance *per se*, the court noted that that case in fact had stated that slaughterhouses as "now regarded as *prima facie* nuisances." This, the court  noted, is a type of nuisance in fact, not a nuisance *per se*. [2]

---

[2]    We may regret the introduction of yet another Latinized phrase into the already-complex law of nuisance in Michigan. Presumably, the use of the term *prima facie* suggests that the plaintiff establishes as a matter of his initial showing that there has been an interference with his use and enjoyment of his land, but the defendant is given an opportunity to show that his conduct is reasonable or that the utility of his conduct is one which should be regarded as outweighing the imposition on his neighbor caused by his activity. This would mean that a *prima facie* nuisance is a nuisance in fact, not a nuisance *per se*.

Certainly, if the operation of a rendering plant is analyzed as a nuisance in fact, the same has to be true of the operation of a wastewater treatment plant, an activity which has clear and direct public benefits, and indeed is undertaken specifically for the protection of public health.

The undisputed facts in this case demonstrate that the East End Water Pollution Control Plant was initially constructed in 1959 by the City of Sault Ste. Marie, Ontario, and the responsibility for operating the plant was transferred to PUC Services in July 2003 under a contract with the City.  In owning and operating the East End plant, however, the City and PUC Services are not engaged in a commercial activity carried on for profit.  Instead, the plant is constructed and operated in order to carry out a necessary and essential municipal function, one which has obvious implications for public health and safety on both sides of the border.

There is nothing about the operation of a wastewater treatment plant which can be regarded as ultrahazardous or "abnormal," the term used in Prosser's formulation. Nor are there harmful effects to the health or well-being of the community arising from the very operation of a wastewater plant. A wastewater treatment plant is perfectly safe and indeed beneficial to society when it is properly operated.

The characteristics of the plant as a public utility, operated in order to protect the health and well-being of residents on both sides of the St. Mary's River and the quality of that river's waters, leads to the necessary conclusion that it is done for a purpose which benefits the public, and thus that the operation of the plant cannot be regarded as a nuisance *per se,* permitting the imposition of liability without consideration of negligence.

The allegations that are raised in this case, given the undisputed facts as they have been demonstrated, should be regarded solely as claims based on "nuisance in fact," which would require a showing of negligence on the part of the operator of the plant before liability may be imposed.

Nuisance *per se*, as a theory that would permit the imposition of liability without a showing of negligence, cannot properly apply to the undisputed facts in this case. For this reason, the Court should grant summary judgment as to Count II of each Complaint.

**Public nuisance**

Count V of each Complaint alleges that the defendant created a "public nuisance". Since the plaintiffs are also alleging a private nuisance, this Count does nothing to expand liability or the right of recovery of damages. In light of the undisputed facts developed in this case, the Court should grant summary judgment on this Count.

One of comprehensive analyses of nuisance law in the state of Michigan in recent times is the case of *Hadfield v Oakland County Drain Commissioner*, 430 Mich 139, 422 NW2d 205 (1988)(later overruled on governmental immunity issues, not involved here). In addition to Prosser, *Hadfield* cited Restatement Torts, 2d, §821(b), for its definition of public nuisance as "an unreasonable interference with **a right common to the general public**."

It then went on to note (as Prosser had noted) that there is some overlap between the two concepts. This is in recognition that an activity which constitutes a public nuisance can also do particularized harm to specific landowners, and in those cases it would constitute a private nuisance as well as a public nuisance.

The Court also quoted from the decision in the case of *Attorney General v Peterson*,

381 Mich 445, 465, 164 NW2d 43 (1969):

> "At common law, acts in violation of law constitute a public
> nuisance. Harm to the public is presumed to flow from the
> violation of a valid statute enacted to preserve public health,
> safety and welfare."

The quoted section just quoted identifies the concept of public nuisance at common

law. It is important to note that this common law concept is based on acts "in violation of law".

There is a statutorily-defined public nuisance in Michigan, described at MCL 600.3801,

*et seq*, but that provision is limited to certain types of illegal activities which are not pertinent

here. (The statute covers such things as the use of a building or a vehicle for purposes of

prostitution, gambling, use or manufacture of drugs, etc.)

As stated by Victor Schwartz and Philip Goldberg in *The Law of Public Nuisance:*

*Maintaining Rational Boundaries on a Rational Tort*, 45 Washburn L.J. 541 (2006):

> "Public nuisance theory has its foundation in twelfth-century
> English common law as a tort-based crime for infringing on the
> rights of the Crown. The King, through a sheriff and later an
> attorney general, could bring suit to stop an infringement and
> force the offending party to repair any damage to the King's
> property. In the fourteenth century, English courts extended the
> principle of public nuisance beyond the rights of the Crown to
> include rights common to the public, such as 'the right to safely
> walk along public highways, to breathe unpolluted air, to be
> undisturbed by large gatherings of disorderly people and to be
> free from the spreading of infectious diseases.' The Crown
> prosecuted violators for committing a criminal offense.
>
> "In assessing whether the conduct amounted to a criminal
> offense, courts weighed the value of the conduct against the harm
> it caused. For example, in a case involving the emission of
> offensive odors by a local candle factory, the court held that the
> odors did not constitute a public nuisance because the factory's

Page 17

> utility outweighed the townspeople's discomfort. The Parliament, viewed as an 'instrument of royal government and the voice of the community,' also performed this utility balancing by passing legislation that labeled certain behaviors public nuisances." [Exhibit 8]

Thus, from the outset, the law balanced the nature of the harm caused by the activity in question against the social utility of the activity in determining whether a public nuisance existed.

One could best differentiate a public from a private nuisance in this fashion: if it interferes with the general right of the public to use common areas such as parks, streets, sidewalks, and beaches, or to be free from dirty air or water, it is actionable by the Attorney General as a public nuisance. If it interferes with an individual's use of his land, it is actionable as a private nuisance.

Under Michigan law, actions do not lie with an individual citizen to file a claim based on an alleged "public nuisance".  A public nuisance as defined under the common law is one which is normally challenged by the Attorney General of the State or by some other official agency, and done in order to vindicate considerations of public health, safety, etc.

Further, Michigan law provides that a plaintiff may not pursue a case based on public nuisance unless he can show that he has sustained an injury that is different in kind from that sustained by members of the public in general. The Michigan Supreme Court noted in *Adkins v. Thomas Solvent Company*, 440 Mich. 293, 487 N.W.2d 715 (1992), in footnote 11, at p. 306:

> "Even if the plaintiffs had argued the case on a public nuisance theory, recovery would be unavailable. Although the contamination of ground water may give rise to an action for

> public nuisance, the plaintiffs must show harm of a kind different from that suffered by other members of the general public exercising the right common to the general public that was the subject of interference. 4 Restatement Torts, 2d, § 821C, p. 94. See, e.g., *Philadelphia Electric Co. v. Hercules, Inc.*, 762 F.2d 303 (CA 3, 1985)."

A dramatic early case, which has some self-evident relevance to the current litigation, is the case of *Attorney General ex rel Wyoming Township v City of Grand Rapids*, 175 Mich. 503, 141 N.W. 890 (1913). This was an action filed by the Attorney General of the State of Michigan to ask the Court to declare and abate the continued deliberate pollution of a river by the release of untreated wastewater as a public nuisance.

The relators in the case were inhabitants of Grandville, some seven miles downstream from the City of Grand Rapids. The public nuisance claim was based on the fact that the City of Grand Rapids daily discharged a significant amount of its municipal wastewater directly into the waters of the Grand River, without any treatment whatsoever, and further that it collected waste on a daily basis from outlying homes that were not connected to the sewer system and dumped that waste directly into one of the sewer drains, adding to the burden.

Although it was not emphasized in the early part of the opinion, the following is found at page 542 and undoubtedly contributed to the Court's holding in favor of the Attorney General's complaint:

> "It appears in this case and it is well known that modern scientific research has discovered means of disinfecting and deodorizing sewage so that it is practically innocuous."

It thus appears that one of the reasons that the Court found liability on the part of the City of Grand Rapids is that it had available to it technological means to treat municipal

wastewater, but had failed to do anything to take advantage of those technologies. Instead, it simply released its raw sewage into the waters of the Grand River.

A consideration of the facts as recited by the Court indicates that the harm to the public was based on the fact that sewage would accumulate on the banks of the river after high water flooding, giving rise to offensive odors. There was no discussion of deleterious effects on the waters of the river itself, its effect on recreation, fishing, boating, swimming, etc. Importantly, there was no consideration of the effect of those materials on individual landowners. The Court was concerned about their effects on the public at large, noting that "decomposition [of the sewage] creates such odors as to constitute a public nuisance in the village".

The Court declared the dumping a "public nuisance". After considering all of the evidence brought by both sides, the Court held:

> "In our opinion the equities of the case are with the complainants, and the testimony makes out a case of public nuisance. . . If the City creates, or threatens to create a public nuisance, particularly outside of its corporate limits, it is subject to the same rules as would be a private individual. . ."

This early decision did nothing to identify the criteria that would characterize a public nuisance or differentiate it from a private nuisance, since public nuisance was the only issue at hand. Certainly, though, the following facts were significant to the Court's ruling:

1.  This was an action brought by the Attorney General of the State, in relation to a community living downstream, not for or on behalf of any identified individual landowners.

2.  The hazards produced – offensive odors arising from contamination of land adjoining the river after flooding conditions – were such as would affect the entire community, and not just adjoining landowners.

Page 20

3.    The State of Michigan undoubtedly has a governmental interest in maintaining sanitary conditions by one city using a river, for the protection of other communities downstream from that community.

What provides the hallmark of public nuisance and differentiates it from the concept of private nuisance is:

1.    The fact that the activity is subject to the equitable authority of the Court to abate the nuisance – that is, to order that certain actions be discontinued or to order that other actions be taken in order to reduce or remove the harmful activity.

2.    The fact that the activity in question might be subject to criminal penalties rather than to tort liability.

In this case, of course, the claims that are made here are simply damages claims, based on a claim of private nuisance, raised by individual landowners who are seeking damages for their own loss of use and other claimed effects on their riverfront land holdings. There has been no enforcement activity undertaken by the Attorney General of the State of Michigan, by the prosecuting attorney in Chippewa County, Michigan, or by the United States Environmental Protection Agency, either in court of by use of administrative proceedings, directed at the operation of the East End plant. (Given the fact that the East End plant is located in Canada, of course, there would be significant jurisdictional issues raised if that had been done.)

The plaintiffs here do not allege that they have suffered any particular injury that differs from that allegedly suffered by the public as a result of the alleged contamination of the St. Mary's River. To the extent that the plaintiffs have experienced inconvenience and annoyance as a result of "no-body-contact" directives issued by the Chippewa County Health Department, that inconvenience is the same that every citizen sustained as a result of the order.

Page 21

In light of the concept of public nuisance that is recognized under Michigan law, the claims that are made here do not fit that recognized cause of action. Therefore, Count V of each Complaint should be dismissed given the fact that the undisputed facts of this case show that it is not applicable to these claims.

**Trespass**

Count VI of the Second Amended Complaint in *Welch*, and Count IX of the *Bean* Complaint, purport to state a claim based on trespass. Trespass, however, is not recognized as a cause of action under Michigan law for claims based on the release of noxious materials.

It is undisputed between the parties, and essentially found *passim* in many of the depositions that have been taken, that the observations and findings that form the basis of the plaintiffs' claims include:

- Surface water testing that reported, at certain times and places, elevated levels of *E. coli* and other organisms,
- Observations of floating masses of brownish materials that appeared to the naked eye to resemble sewage or waste – floating in the river and sometimes washing up on Sugar Island shoreline; and
- Observations of identifiable solid items such as condoms, syringes, potato chip bags, etc., occasionally washing up on shorelines.

It is undisputed that this is what has been found. The dispute between the parties is what these observations really represented or where they came from. For purposes of this motion, however, the Court does not need to address the latter issue.

In *Adams v. Cleveland-Cliffs Iron Company*, 237 Mich.App. 51, 602 N.W.2d 215 (1999), the plaintiffs were a group of homeowners who lived in the vicinity of the Empire

Mine in Marquette County, Michigan. They complained that the operation of the mine resulted in invasions of their homes by "intrusions of dust, noise, and vibrations". The Court began by declaring its holding:

> "We conclude that the law of trespass in Michigan does not cover airborne particulates, noise, or vibrations, and that a complaint alleging damages resulting from these irritants normally sounds instead in nuisance."

The Court's detailed analysis of the difference between the two causes of action is found under Part II. 237 Mich App at 58, 602 N.W.2d at 218. The central point of the discussion is based on a quote that originated with Prosser and which had been accepted in previous Michigan cases:

> "Trespass is an invasion of the plaintiff's interest in the exclusive possession of his land, while nuisance is an interference with his use and enjoyment of it." § 87, p. 622.

It went on to observe:

> "Because a trespass violated a landholder's right to exclude others from the premises, the landholder could recover at least nominal damages even in the absence of proof of any other injury. Id. Recovery for nuisance, however, traditionally required proof of actual and substantial injury. Further, the doctrine of nuisance customarily called for balancing the disturbance complained of against the social utility of its cause.

> "Traditionally, trespass required that the invasion of the land be direct or immediate and in the form of a physical, tangible object. [citations omitted] Under these principles, recovery in trespass for dust, smoke, noise, and vibrations was generally unavailable because they were not considered tangible or because they came to the land via some intervening force such as wind or water. Instead, claims concerning these irritants were generally pursued under a nuisance theory."

The Court then considered the trend of cases in other jurisdictions which had tended to loosen some of those restrictions and blurred the distinctions between the torts of trespass and nuisance, but concluded:

> "This so-called 'modern view of trespass' appears, with all its nuances and add-ons, merely to replicate traditional nuisance doctrine as recognized in Michigan." 237 Mich App at 64, 602 N.W.2d at 221

It then went on to hold that even the rain of dust and small particles would not be regarded as an incursion onto land by a tangible thing, even though they technically involve a physical object in a sense. It observed:

> "Dust particles do not normally occupy the land on which they settle in any meaningful sense; instead they simply become a part of the ambient circumstances of that space. If the quantity and character of the dust are such as to disturb the ambiance in ways that interfere substantially with the plaintiff's use and enjoyment of the land, then recovery in nuisance is possible."

The Court's ruling was:

> "Recovery for trespass to land in Michigan is available only upon proof of an unauthorized direct or immediate intrusion of a physical, tangible object onto land over which the plaintiff has a right of exclusive possession. Once such an intrusion is proved, the tort has been established, and the plaintiff is presumptively entitled to at least nominal damages. Where the possessor of land is menaced by noise, vibrations, or ambient dust, smoke, soot, or fumes, the possessory interest implicated is that of use and enjoyment, not exclusion, and the vehicle through which a plaintiff normally should seek a remedy is the doctrine of nuisance. To prevail in nuisance, a possessor of land must prove significant harm resulting from the defendant's unreasonable interference with the use or enjoyment of the property." 237 Mich App at 67, 602 N.W.2d at 222.

And in the concluding section, the Court stated:

> "There is no need to reformulate the traditional law of trespass to accommodate the problems of airborne pollution, noise, or vibrations, because the doctrines of nuisance and related causes of action have always stood ready to provide remedies." 237 Mich App at 72-73, 602 N.W.2d at 225.

*Adams* has not been criticized or questioned in any later case, state or Federal, addressing Michigan law.

The defendant submits that there can be no meaningful difference drawn between the incursion onto plaintiffs' lands by dust, particulates, and the like, as involved in *Adams*, and the incursion claimed here, consisting of bacteria allegedly released from the East End plant and floating solids that have been allegedly observed to wash up on beaches. The claims involving floating identifiable objects, such as condoms and the like (alleged in Count I, at paragraph 106(i) of the Bean complaint), may be a closer question, but defendant submits that they, too, are more akin to the dust and particulates than they are to larger incursions by people, animals, or "tangible things", as required under trespass law.

Defendant therefore also requests summary judgment on the trespass Counts of each Complaint.

<div style="margin-left: 50%;">

**GARAN LUCOW MILLER, P.C.**
Attorneys for Defendants

</div>

Date:  April 20, 2009

<div style="margin-left: 50%;">

_____/s/_____
**M. Sean Fosmire (P31737)**
1440 West Ridge Street
Marquette, Michigan 49855
(906) 226-2524
sfosmire@garanlucow.com

</div>

G:\FILES\4407\Brief Apr 09\Brief MSJ 2.wpd